Joseph C. Grew v. Commissioner.
Grew v. Commissioner
Docket No. 14869.
United States Tax Court
1948 Tax Ct. Memo LEXIS 116; 7 T.C.M. (CCH) 538; T.C.M. (RIA) 48153; August 17, 1948
*116 A trust created in form analogous to that of a corporation for the purpose of buying and selling property, real or personal, held, an association taxable as a corporation. Ernest G. Angevine, Esq., Hutchins & Wheeler, 49 Federal Street, Boston, Mass., for the petitioner. L. C. Duersten, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion The Commissioner determined a deficiency in income tax and victory tax of $6,455.83 for the year 1943. The primary question to be determined is whether the Grew Real Estate Trust is an association taxable as a corporation under section 3797 (a) (3), I.R.C. If held not to be such an association, a further question to be determined is petitioner's basis of 71 shares of stock of Hazelwood Corporation. Findings of Fact The facts, as stipulated are as follows: The petitioner reported his income for Federal tax purposes for 1942 and 1943 on the cash receipts and disbursements method of accounting. He filed his 1942 and 1943 income tax return with the collector of internal revenue for the District of Massachusetts. Henry Grew died in 1892. His heirs, by inheritance through *117 him and directly, owned undivided interest in certain personal property and real estate which they transferred to Edward W. Grew and Randolph C. Grew, who executed a voluntary declaration of trust dated July 1, 1910, called the Grew Real Estate Trust. The declaration of trust was recorded with Suffolk County Registry of Deeds in Book 3505, page 321. It was amended April 17, 1929 and July 10, 1936. These documents are included herein by reference. The declaration of trust provided that the trust was to "continue, unless sooner terminated as hereinafter provided, until five (5) years after the death of that one who dies last of the following named persons, viz.: Jane Norton Grew, widow of Henry Sturgis Grew, Edward S. Grew of said Boston, Annie C. Grew, wife of said Edward S. Grew, said Randolph C. Grew, Henry S. Grew and Joseph C. Grew, the last three being sons of said Edward S. Grew, and said Edward W. Grew, Jane N. Morgan, Henrietta M. Crosby and Elizabeth S. Beal, the last four being children of said Jane Norton Grew. * * *
"Third: The beneficial interest in the property held by the trustees is divided into five hundred and seventy-six (576) shares, and said shares *118 are now held as follows: Jane Norton Grew
154 shares
Edward W. Grew
34 shares
Jane N. Morgan
34 shares
Henrietta M. Crosby
34 shares
Elizabeth S. Beal
34 shares
Edward S. Grew
283 shares
George Wigglesworth and others,
Trustees of the Wigglesworth Real
Estate Trust
3 shares
Said persons and their respective executors, administrators, and assigns, constitute the shareholders or beneficiaries in said trust. No person shall be regarded as a shareholder or be entitled to any rights as such except the persons appearing on the books of the trustees from time to time as registered holders of shares. "Fourth: The shares in this trust shall entitle the holders thereof to a share of all dividends, and to an ultimate interest in the division of said property or the proceeds thereof, according to the terms of this initrument. Said shareholders shall have no other interest in the trust property itself, whether real or personal, and no right to call for any partition thereof, or to exercise any control thereover, except as herein provided, and the death of any shareholder during the continuance of this trust shall not determine the trust, nor entitle the legal representatives *119 of such deceased shareholder to an account or to any rights in the property or against the trustees, except as successor to the rights of such deceased shareholder and pursuant to the terms of this instrument. All legal rights in or to shares shall, except as herein otherwise provided, be determined as if the trust property consisted exclusively of real estate. Any shareholder may, by agreement with the trustees, at any time lease or purchase property from or let or sell property to the trustees; and any shareholder so purchasing property may by agreement with the trustees pay therefor by transferring shares to the trustees at such valuation as may be agreed upon, and shares so transferred shall be dealt with in the same manner hereinafter provided as to shares purchased by the trustees. "Fith: The trustees shall issue to each shareholder one or more certificates showing his or her interest under this trust, and shall keep a record of all certificates so issued, in a book kept for the purpose. Such certificates shall be alike in form, signed by the trustees for the time being, shall bear reference to this trust, and upon the face thereof shall be in substantially the following form: *120 "COMMONWEALTH OF MASSACHUSETTS
"Certificate No. Shares. "GREW REAL ESTATE TRUST 576 SHARES "This Certifies That is the holder of shares in the GREW REAL ESTATE TRUST entitling the holder to the rights and subject in all respects to the provisions set forth in a declaration of trust dated July 1, A.D. 1910, and duly recorded in the Registry of Deeds of the County of Norfolk in said Commonwealth and elsewhere. Said shares are transferable only on the books of the trustees by the holder in person or by attorney duly authorized and upon the surrender of this certificate. The right to transfer shares is subject to the provisions of said declaration of trust to which special reference is made. "In Witness Whereof the trustees of the Grew Real Estate Trust have hereto set their hands this day of A.D. 19 "The trustees may upon such evidence as they deem satisfactory that any certificate has been lost, mutilated or destroyed and upon receiving indemnity satisfactory to them or upon surrender of a certificate, issue a new certificate in place thereof. * * *
"Eighth: The trustees under this instrument shall have the following powers and duties: "1. To receive and *121 collect all interest, rentals, dividends and other income and all profits and proceeds of the property held by them. "2. To employ such agents as they think fit in the care and management of the property and administration of the trust, including the collection of income, making of leases and sales, and all other transactions, and to incur such liability and expenses and pay from the trust property in their hands all such sums as they think proper for the management and care of said property, including the organization of this trust, interest, taxes, assessments, fire and other insurance, repairs, counsel fees, wages and salaries of agents and employees and all other charges. "3. As to any real estate held by them, to make surveys thereof, lay out, dedicate and construct streets and ways through the same, adopt plans for the development thereof, divide the same into building lots, and impose such restrictions and limitations upon the use thereof as they think fit; to make any improvements, changes, or alterations in or upon any real estate held by them, including the erection of buildings thereon and tearing down and rebuilding any structures from time to time existing thereon; *122 and to pay for all expenses incurred hereunder from the trust property in their hands or from money borrowed as hereinafter provided. "4. To lease from time to time for such periods, including periods that may extend beyond the duration of this trust, and on such terms as they shall think fit all or any real or personal property. "5. To exchange, sell, and convey with such convenants as they think proper, or without any covenants, all or any part of or any interest in or easement or privilege over any trust property held by them, at public or private sale, for cash or on credit, on such terms and for such consideration, and with such restrictions and reservations, as they may think fit, or otherwise to dispose of any property so held by them, including power to give partial releases of any mortgage held by them, upon such terms and for such considerations as they shall deem expedient, and to make partition of any real estate in which the trustees hold an undivided interest in common with any other person, and to pay or receive owelty on any such partition. "6. To buy and pay for from the trust property in their hands, or with money raised by them, as hereinafter provided, or *123 otherwise to acquire from time to time and as often as they shall think fit, any property, real or personal, wherever situated, including shares in this trust, for such price and upon such terms as they think fit, and to hold the same with the same powers of management and sale as are herein provided; to invest any money or property in their hands in such manner as they think fit, and from time to time and as often as they shall think fit to change investments. "7. To borrow, with or without any personal obligation for the repayment thereof, money to improve any part of the trust estate, or to purchase other property to be held subject to this trust, or to use for any purpose authorized by this instrument, including the purchase of shares in this trust, and to mortgage or pledge any of the trust property to secure the repayment of any sums so borrowed, and to indemnify themselves against personal liability therefor, and to repay any sums so borrowed and any interest accruing due thereon from the trust property in their hands. "8. To make dividends from time to time for the income of the trust property held by them at such rates as they shall think fit, reserving all or such part *124 of the income in any year as they shall deem proper as a reserve or sinking fund, or both, with power to invest and reinvest the same, and thereafter to distribute all or any part thereof to the shareholders, and to make division of or dividends from the capital of said property or any part thereof whenever they shall think fit. The decision of the trustees whether any sum is income or capital, and whether any expense shall be borne by income or capital, shall be final and conclusive. "9. To take any proceedings at law or in equity with reference to the trust estate, or any matter concerning it, and to represent the interest of the trust estate in any proceedings brought by or against them, or in any way affecting it, with power to compromise and refer to arbitration any dispute in any way affecting said trust property. "10. To enter upon any property mortgaged to them, execute any power of sale contained in any such mortgage, and do any act necessary or proper to foreclose the same. "11. To make, execute, acknowledge and deliver all necessary or proper deeds, instruments and agreements conveying the said trust property or any part thereof, or any interest therein, or in any *125 way relating to or affecting the same, or to carry out any of the powers herein contained. "12. To do any and all acts in the care and management of the trust property and to exercise any power or authority appurtenant thereto or connected therewith which they might do or exercise if they were the owners thereof free from any trust, without the generality of this power being limited by the foregoing enumeration of express powers, and no third person dealing with the trustees shall be bound to see to the application of any money or valuable consideration paid to the trustees, or to inquire into the existence of any facts authorizing any action taken by the trustees. "13. The trustees shall annually render to the shareholders an account of the trust, and shall keep books of account showing their transactions, which books shall be open to inspection by any shareholder at all reasonable times. * * *
"Tenth: The trustees shall not have power to create any personal liability on the shareholders, but all contracts made by them, including any covenants contained in any conveyance by them, shall be binding upon the trust property in their hands, and every written contract or other *126 instrument made or executed by them shall refer to this instrument, and all persons contracting with the trustees shall look only to the trust property for satisfaction of any liability or obligation, and neither the trustees nor the shareholders shall be personally liable therefor. * * *
"Fifteenth: The trustees shall be under no liability except to the persons appearing on their books to be the registered holders of shares, and shall not be bound to inquire as to the legality, cause or purpose of any transfer of shares. They shall not be liable the one for the acts of any other, nor for the acts or defaults of any agent, servant or employee, nor for more money in any event than they actually receive, nor for any cause except each for his own personal and wilful default or misfeasance. * * *
The declaration of trust further provided that the shares were transferable only upon the books of the trustees by instrument in writing executed by the holder or duly authorized attorney. Any shareholder, or executor or administrator of any deceased shareholder desiring to sell or transfer his or her shares was required to first offer such shares to the trustees for purchase by *127 them. In case the shares so offered were not purchased by the trustees they could be sold to any other person. Paragraph Eleventh provided for the appointment of successor trustees. This paragraph was amended July 13, 1936, by the holders of at least three-fourths of the shares outstanding to provide that the number of trustees should be either two or three in the absolute discretion of the trustees and that should a vacancy arise due to resignation, death or other cause the new trustee or trustees should be appointed by the remaining or surviving trustee or trustees by an instrument in writing under seal. The assets transferred to the Grew Real Estate Trust and the opening entries appearing on the books of the trust were as follows: Real Estate
49-51 Franklin Street, Boston, Mass.
$147,000.00
Hyde Park Property
1,363.15
Hyde Park Property (318 acres)
132,825.00
Personal Property
Stocks
33,580.00
Bonds
2,750.00
Cash
5,160.33
Miscellaneous assets
433.28
The petitioner acquired by inheritance from the Estate of Edward S. Grew 71 shares of the above trust. The fair market value of such 71 shares on January 20, 1916 was $463.50 per share, or a total *128 value for the 71 shares of $32,908.50. The trustees leased the Franklin Street property throughout the years 1910 to 1917, inclusive. Meredith and Grew, a Boston real estate firm, managed such property and collected the rents but did not pay the taxes. In December, 1916, a down payment of $1,000 on the sale of the property to G. M. Cushing and M. Prince, trustees, was received. In February, 1917, the balance of $134,000 was received from such trustees, the gross sales price being $135,000. The proceeds of the sale of the Franklin Street property were reinvested by the trustees in stocks and bonds. During the years 1910 to 1917, inclusive, the net rentals of the Franklin Street property, exclusive of taxes, received by the trustees and the net income of the Franklin Street and Hyde Park real estate and the net income of the trust were as follows: Net Rentals
Franklin St.,
Net Income
Net
exclusive
[of]
Income
Year
of taxes
Real Estate
of Trust
1910
$3,969.29
- $3,723.14
$ 705.12
1911
7,772.38
- 693.00
1,318.61
1912
6,957.08
- 2,853.78
- 718.00
1913
8,995.58
- 688.98
1,434.86
1914
7,948.44
- 1,982.56
26.17
1915
7,195.01
- 1,354.55
777.18
1916
4,358.82
- 4,980.24
- 2,856.72
1917
635.96
- 5,703.02
2,412.58
*129 In November, 1912, Edward M. Grew and Randolph C. Grew, trustees, loaned the trust $687.50. In April, 1914, each loaned the trust $250 and in January, 1914, Edward W. Grew loaned the trust $750. In October, 1916, the beneficiaries advanced $5,184.01 to pay taxes. In October, 1922, each trustee loaned the trust $500, in November each loaned the trust $300, and in December Randolph C. Grew loaned the trust $200. In November, 1923, Edward W. Grew loaned the trust $100 and in December each trustee loaned the trust $200. In 1924 Edward W. Grew loaned the trust $550 and Randolph C. Grew loaned it $650. In 1925 the National Union Bank loaned the trust $3,500. All these loans and advancements were repaid. During 1923 the smaller Hyde Park property was sold for a gross sales price of $1,948.54. Such proceeds were not distributed to the shareholders of the trust. During 1925, the 318 acres of unimproved Hyde Park real estate were sold to Bonelli-Adams Company, title being taken in the name of a nominee, James D. White. The trustees received $5,000 cash and a purchase money mortgage of $195,000. Bonelli-Adams plotted and subdivided the property in streets and lots, sold lots and secured *130 partial releases from the trust for which Bonelli-Adams made payments to the trust. On April 1, 1928, the trust released 123 acres of land to Alice M. Rourke, who mortgaged the property back to the trust for $40,000. On April 1, 1929, title to another parcel of lots was taken by Alice M. Rourke, for which the trustees received a new mortgage of $130,000. The trustees executed partial releases from the original $195,000 mortgage of the property conveyed to Alice M. Rourke. By instrument in writing dated April 17, 1928, Randolph C. Grew delegated all his duties as trustee to Henry S. Grew and appointed the latter as his attorney to act in his place and stead. In 1930, Bonelli-Adams having failed to pay the real estate taxes on the property conveyed in 1925, the trustees paid taxes to the City of Boston for 1928, 1929 and 1930 of $4,097.79, $4,077.36 and $5,362.50, or a total of $13,537.65. By deed dated January 3, 1931, Alice M. Rourke conveyed part of the property, which had been subject to the mortgages of April 1, 1928 and 1929, to the City of Boston. The trustees released this land and received $80,000 from Alice M. Rourke, $40,000 of which was used to pay in full the mortgage *131 dated April 1, 1928, $19,497.80 was applied to interest due, and $13,537.65 for repayment to the trustees of the real estate taxes paid by them in 1930. The balance of $6,964.55 was applied to the original mortgage. On January 7, 1931, the trustees discharged the $40,000 mortgage dated April 1, 1928. The following entries appear in the surplus account on the books of the trust: January 8, 1931
Distribution to stockholders
$72,000.00
August 31, 1932
Distribution to stockholders
5,760.00
May 21, 1934
Distribution to stockholders
10,080.00
December 20, 1939
Distribution to stockholders
1,393.92
December 23, 1940
Distribution to stockholders
12,096.00
December 23, 1941
Distribution to stockholders
9,717.12
December 22, 1942
Distribution to stockholders
7,901.00
On January 8, 1931, the trust distributed to its shareholders $72,000. The distribution by the trust was equal to $125 per share. The petitioner received as part of his share of the distribution $8,875. This payment of $8,875 to petitioner was a distribution of taxable income and not a return of capital or a dividend in liquidation and was taxed to him as taxable income, the tax on which *132 was paid and no part of which has ever been refunded. The trustees paid the Boston tax, as follows: Year
Amount
1931
$3,915.45
1932
5,481.56
1933
6,180.50
1934
6,764.83
1935
6,619.27
On December 30, 1935, a new mortgage was given by the Boston District Development Corporation* to the trust for $250,000. This mortgage was foreclosed November 10, 1937. The trustees bid in the property at the foreclosure sale for $175,000. On November 22, 1937, the following entry was made in the real estate account on the books of the trust: "Land - Real Estate. To record reacquirement of property at fair market value of $135,000." This same entry was journalized and set up in the real estate sales account. To the real estate account on the ledger of the trust, amounts were added to the reacquired cost of $135,000, as follows: Commission on sale
$ 30.00
Expenses of real estate sales
105.46
Foreclosure service
200.00, making a total of $135,335.46. From this was subtracted on the other side of the ledger, the following: Miscellaneous sales
$3,240.00
Loss, additional on above sales
335.46
*133 Twelve lots which constituted part of the foreclosed real estate were subject to agreements to sell made by the prior owner. By a journal entry these lots were set up for a total of $3,240 as an account receivable and by a similar entry the loss on the sale of some of these lots was set up as $335.46. In making the tax return for the year 1937, the trustees showed a sale price in reporting this foreclosure of $135,000. In 1939, sewer assessments total $62.50 were added to the real estate account. On November 16, 1939, the real estate appears on the ledger account of the trust at $131,822.50. The assessed valuation of the Hyde Park property for 1937 was $167,000 and for the year 1938, allowing for abatements secured in 1943, was $149,487.17. The Hazlewood Corporation was organized and incorporated under the laws of Massachusetts on October 20, 1939, for the purpose of handling the sale of real estate. Its capital stock consisted of 576 shares of no par value common stock. On October 27, 1939, the trustees transferred to Hazelwood Corporation, solely in exchange for all its capital stock, the Hyde Park real estate shown on the books of the trust as having a value of $131,822.50, *134 the accounts receivable having a basis on the books of the trust of $1,032.23, which represents the item of "Miscellaneous Sales" of $3,240 less the sales credited to the account, and Government bonds having a face value and basis according to the books of $5,000, making a total of $137,854.83. The corporation issued 72 shares of its stock for the $5,000 face value Government bonds and 504 shares for the land conveyed to it by trustee's deed without covenants, dated October 27, 1939. On November 18, 1939, the corporation sold all the land conveyed to it by the trustees, except the lots carried on the books for $1,032.23, to Lillian E. Wolsey for $35,000, which was paid entirely by a noninterest bearing note and mortgage. This mortgage was paid in full on December 31, 1942 and the mortgage was discharged on December 31, 1942. The few lots not conveyed by this sale were either sold by Hazelwood Corporation to persons who had made down payments on them to the former owner under bonds-for-deeds or to Lillian E. Wolsey. On December 31, 1942, all the assets of Hazelwood Corporation had been reduced to cash. Entries appear in the capital account on the books of the trust as follows: *135 May 14, 1943
Distribution of capital
$239,160.00
April 23, 1943
Distribution of Hazelwood Corp. stock
137,854.83
December 22, 1943
Distribution of capital
6,460.42
On January 1, 1943, the trust held approximately $133,000 worth of securities which were sold during 1943. On April 23, 1943, the petition received from the trust 71 shares of Hazelwood Corporation no par value common stock, having a fair market value of $68 a share. On May 7, 1943, the stockholders of Hazelwood Corporation authorized its president and treasurer to transfer the net assets of the corporation, consisting of cash, to the stockholders in proportion to their stockholdings. The petitioner, on May 7, 1943, received on final liquidation and dissolution of the Hazelwood Corporation $4,828 in cancellation and redemption of his 71 shares of no par value common stock. The corporation was dissolved by order of the Supreme Judicial Court of Suffolk County, Massachusetts, on October 13, 1943. The petitioner on May 14, 1943, received a cash distribution in liquidation of the trust of $29,110, or an equivalent of $410 per share. On December 7, 1943, the trust received a tax refund from *136 the City of Boston resulting from the abatement of real estate taxes on the Hyde Park property for 1938 and 1939 of $5,148.45. On December 22, 1943, the petitioner received the final cash distribution of $796.34 from the trust. The capital account and real estate account in the general ledger of the trust indicate that no real estate was purchased by the trustees during the years 1910 to 1943, inclusive, other than real estate reacquired on foreclosure. The stock certificate book of the trust shows that no shares were sold and no shares were transferred except to members of the Grew family. Edward W. Grew, one of the original trustees of the trust, died on January 25, 1945. For the calendar years prior to 1936, the trust filed corporation income tax returns. For the calendar years 1936 to 1943, inclusive, it filed fiduciary income tax returns. The taxable portion of the State Street Investment Corporation dividend for the calendar year 1943 was $1,180.57. The record discloses additional facts as follows: The Hyde Park property was rural territory and was located on the far outskirts of Boston. After the death of Henry Grew in 1892, his two sons and their respective families *137 made visits of some weeks duration to the old homestead on the property but these visits were discontinued after about 1900. In July 1936, when Alexander Wheeler, the son-in-law of Henry S. Grew, was appointed trustee, various beneficiaries were dissatisfied with the management of the trust and in particular with the Bonelli transaction and the advancement of funds by the trustees to him without getting results. The two other trustees were substantially older than Alexander Wheeler and it was "difficult to get any action from them". Randolph C. Grew was entirely inactive in trust affairs. After July, 1936, advances to Bonelli were cut down and in 1937 the mortgage was foreclosed. After the foreclosure and reacquirement of the property an effort was made to sell the property by placing it in the hands of Meredith and Grew and other real estate concerns for that purpose. Edward W. Grew, one of the original trustees, was a member of the firm of Meredith and Grew. The respondent held that the Grew Real Estate Trust was an association taxable as a corporation and determined petitioner's tax accordingly. We make the following ultimate finding: The Grew Real Estate Trust was, in *138 the taxable years, an association taxable as a corporation under the provisions of section 3797 (a)(3) of the Internal Revenue Code. Opinion VAN FOSSAN, Judge: The question to be determined is whether the Grew Real Estate Trust was an association taxable as a corporation. The petitioner contends that the trust was a strict trust organized for the purpose of facilitating the liquidation of family property. He relies in particular upon the testimony of his brother, Henry S. Grew, viz., that no member of the Grew family wanted the Hyde Park property as a permanent home, that, therefore, in 1910 it was agreed that the property should be liquidated, and that the trust was formed for such purpose. In Helvering v. Coleman-Gilbert Associates, 296 U.S. 369, the Supreme Court stated that the "parties are not at liberty to say that their purpose was other or narrower than that which they formally set forth in the instrument under which their activities were conducted." To the same effect are: Fletcher et al., v. Clark, 150 Fed. (2d) 239, certiorari denied 326 U.S. 763; Commissioner v. Security-First Nat. Bank of Los Angeles, et al., (CCA-9) 148 Fed. (2d) 937; *139 Title Insurance & Trust Co. v. Commissioner, (CCA-9) 100 Fed. (2d) 482; Commissioner v. Vandegrift Realty & Investment Co., (CCA-9) 82 Fed. (2d) 387; and Sears et al. v. Hassett, (CCA-1) 111 Fed. (2d) 961, wherein the Circuit Court stated: "* * * the character of the trust as an association is not determined by the intentions or expectations of its creators, proved by parol, nor by the extent to which the powers in the trust instrument have actually been exercised, but rather by the purposes and potential activities as disclosed on the face of the trust instrument. * * *" The declaration of trust discloses no purpose of liquidation. The powers granted to the trustees were very broad. Such powers included, among others, the development and improvement of the realty and the construction of buildings thereon, the purchase, leasing, exchange and sale of any property, real or personal wherever situated and the payment therefor from trust property or with money raised by them or otherwise, and the distribution to the shareholders of the income of the trust or the accumulation and investment and reinvestment thereof as they thought fit. The trust *140 resembled corporate form in that there were trustees as a continuing body with provision for succession, centralized management, continuity unaffected by the death of beneficiaries, transferability of interests, and limitation of personal liability of the participants. In addition to the 318 acre Hyde Park property, the trustees held two other real properties, one of which was sold in 1916-1917 for $135,000 and the other in 1923. The proceeds of $135,000 were invested in stocks and bonds. Although Henry S. Grew also testified that such proceeds were retained to finance the upkeep and taxes of the Hyde Park property, it was stipulated that income was distributed in substantial amounts to the beneficiaries from 1931 to 1942 inclusive. The trust carried on its operations from 1910 without any distribution of capital assets or distribution in liquidation until 1943, a period of about 33 years. It is stipulated that for all years prior to 1936 the trust filed corporation income tax returns. Thus until 1936 the trust was considered by the trustees-beneficiaries an association taxable as a corporation. The trust in A. A. Lewis & Co., et al. v. Commissioner, 301 U.S. 385, *141 relied upon by petitioner, is essentially dissimilar from the trust involved herein. The trust therein was created for the benefit of the grantor of a tract of land and his exclusive sales agent for the purpose of subdividing and selling the land. The trust was adopted merely as a convenient means of making effective the sales of the agent. The duties of the trustees were purely ministerial. They had no power to control, direct, or participate in, the conduct of the selling enterprise. In the operation of the business there was no essential characteristic of corporate control, nothing analagous to a board of directors or shareholders, no exemption from personal liability and no issue of transferable certificates of interest. In Helvering v. Washburn, 99 Fed. (2d) 478, also cited by petitioner, the trust was formed for the purpose of getting the title to 127,000 acres of grazing land in Texas in condition to make a sale of the property. This was necessary because of the large number of persons interested in the property who were scattered over the country. The trustee had no power of reinvestment of the proceeds of a sale or from current income except for repairs and *142 improvements on the property. To discuss all the cases cited by the parties would serve no useful purpose. Each case must be determined upon its own peculiar facts. In St. Louis Oil Royalty Trust, et al., 5 T.C. 179, it is stated: "* * * With the decision in Morrissey v. Commissioner [296 U.S. 344] and its companion cases it has become settled that the powers conferred in the instrument creating an organization rather than some more limited actual conduct is determinative of whether the enterprise is an association taxable as a corporation, Helvering v. Coleman-Gilbert Associates, [supra] * * *." In our opinion, under that rule, the Grew Real Estate Trust was in the taxable years an association taxable as a corporation under section 3797 (a) (3) of the Internal Revenue Code. In view of our decision it is not necessary to determine the basis of the 71 shares of Hazelwood Corporation stock. The respondent conceded that the taxable portion of the State Street Investment Corporation dividend for 1942 was $1,180.57 instead of $1,191.66. He also conceded that the gain realized on the liquidation of the trust in *143 1943 was overstated to the extent of fifty per cent of $8,875. Decision will be entered under Rule 50. Footnotes
*. It is indicated in the record that this was a Bonelli corporation.↩